## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOHN HEINRICH, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) **Case No.** ) |
| v. | ) **CLASS ACTION COMPLAINT FOR** ) **VIOLATIONS OF SECTIONS 14(a) AND** ) **20(a) OF THE SECURITIES** |
| STONE ENERGY CORPORATION, JAMES MOORE TRIMBLE, NEAL P. GOLDMAN, JOHN JUNEAU, CHARLES M. SLEDGE, and DAVID RAINEY, | ) **EXCHANGE ACT OF 1934** ) ) **JURY TRIAL DEMANDED** ) ) |
| Defendants. | ) ) |

Plaintiff John Heinrich ("Plaintiff"), by and through his undersigned counsel, alleges upon personal knowledge with respect to themselves, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and on behalf of all other similarly situated public common stockholders of Stone Energy Corporation ("Stone" or the "Company") against the Company, James Moore Trimble, Neal P. Goldman, John Juneau, Charles M. Sledge, and David Rainey, the members of Stone's board of directors (collectively referred to as the "Board" or the "Individual Defendants"), for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S,C. §§78n(a) and 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9 in connection with acquisition of Stone by Talos Energy LLC ("Talos") through a merger transaction as alleged in detail herein ("Proposed Transaction").

2.      On November 21, 2017, Stone and Talos issued a joint release announcing the entry into a Transaction Agreement (the "Transaction Agreement") by and among the Company, Talos,

Sailfish Energy Holdings Corporation ("New Talos"), Sailfish Merger Sub Corporation ("Merger Sub"), and Talos Production LLC, pursuant to which Talos and the Company will both become wholly owned subsidiaries of a new holding company, Talos Energy, Inc. ("Talos Energy"), which at closing will become a publicly traded entity.  Pursuant to the terms of the Transaction Agreement, Stone's public common stockholders will receive one share of New Talos in exchange for each share of Stone they own (the "Merger Consideration").  The Proposed Transaction is valued at approximately $2 billion.

3.      As a result, if the Proposed Transaction is consummated, former Stone stockholders will hold 37% of the outstanding shares in Talos Energy, while former Talos stockholders will hold approximately 63% of the outstanding shares in Talos Energy.

4.      On December 29, 2017, in order to convince Stone's stockholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading Form S-4 Registration Statement (the "S-4") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

5.      In particular, the S-4 contains materially incomplete and misleading information concerning: (i) financial projections for the Company; (ii) the valuation analyses performed by the Company's financial advisor, Petrie Partners Securities, LLC ("Petrie"), in support of their fairness opinions; and (iii) the background process leading to the Proposed Transaction.

6.      The special meeting of Stone stockholders to vote on the Proposed Transaction is forthcoming.  It is imperative that the material information that has been omitted from the S-4 is disclosed to the Company's stockholders prior to the forthcoming shareholder vote so that they can properly exercise their corporate suffrage rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Stone's stockholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## PARTIES

8.      Plaintiff is, and have been at all relevant times, a stockholder of Stone common stock.

9.      Defendant Stone operates as an independent oil and gas company.  The Company acquires, explores, develops, and operates oil and gas properties onshore and offshore in the Gulf Coast Basin.  Stone is organized under Delaware state law and its principal office is located at 625 East Kaliste Saloom Road, Lafayette, Louisiana 70508.  Stone common stock trades on the NYSE under the symbol "SGY".

10.     Defendant James Moore Trimble is, and has been since 2017, a director of the Company and currently serves as the President of the Company.

11.     Defendant Neal P. Goldman is, and has been since 2017, a director of the Company and currently serves as Chairman of the Board.

12.     Defendant John Juneau is, and has been since 2017, a director of the Company.

13.     Charles M. Sledge is, and has been since 2017, a director of the Company.

14.     David Rainey is, and has been since 2017, a director of the Company.

15.     The parties in paragraphs 11 through 15 are referred to herein as the "Individual Defendants" and/or the "Board," collectively with Stone the "Defendants."

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

17.     This Court has jurisdiction over the Defendants because each Defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue had an effect in this District; and (ii) Stone is incorporated in this District.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of Stone (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

20.     This action is properly maintainable as a class action because:

    a)  the Class is so numerous that joinder of all members is impracticable.  As of November 1, 2017, there were approximately 20 million shares of Stone common stock outstanding, held by hundreds to thousands of individuals and

entities scattered throughout the country. The actual number of public stockholders of Stone will be ascertained through discovery;

b)   there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

     i.   whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the S-4 in violation of Section 14(a) of the Exchange Act;

     ii.   whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

     iii.   whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading S-4.

c)   Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

d)   Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e)   the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f)  Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g)  a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.   Company Background and the Proposed Transaction

21.   Stone, incorporated on March 15, 1993, is an independent oil and natural gas company.  The Company is engaged in the acquisition, exploration, exploitation, development, and operation of oil and gas properties.  Stone operates in the Gulf of Mexico (GOM) basin.  As of December 31, 2016, the Company's estimated proved oil and natural gas reserves were approximately 53 million barrels of oil equivalents (MMBoe) or 321 billion cubic feet equivalent (Bcfe).

22.   On November 21, 2017, Stone and Talos issued a joint release announcing the Proposed Transaction.  The press release stated, in relevant part:

**Talos Energy LLC to Combine with Stone Energy Corporation**

**Houston, TX and Lafayette, LA** November 21, 2017 — Talos Energy LLC ("Talos") and Stone Energy Corporation (NYSE: SGY; "Stone") today announced that their Boards of Directors have unanimously approved the combination of Talos and Stone in an all-stock transaction that will create a premier offshore-focused exploration and production company.  The company will be named Talos Energy, Inc. and is expected to trade on the New York Stock Exchange ("NYSE") under the new ticker symbol "TALO."

Highlights of the combined company will include:
- Pro forma estimated 2017 average daily production of approximately 47 thousand barrels of oil equivalent (Mboe/d);

- Pro forma proved reserves of 136 million barrels of oil equivalent (MMboe) as of June 30, 2017 based on SEC pricing, which are 69% oil and 74% located in the Deepwater Gulf of Mexico;
- Two recent discoveries, Tornado II and Rampart, provide near-term opportunities for growth;
- Long-term growth profile, underscored by the historic, world-class Zama oil discovery in the shallow waters of Mexico; and
- Strong pro forma balance sheet and credit profile, highlighted by low leverage and ample liquidity.

Under the terms of the transaction, each outstanding share of Stone common stock will be exchanged for one share of Talos Energy, Inc. common stock and the current Talos stakeholders will be issued an aggregate of approximately 34.2 million common shares.  At closing, Talos stakeholders will own 63% of the combined company, with Stone shareholders owning the remaining 37%.  Based on Stone's stock price of $35.49 on November 20, 2017 and the terms of the proposed transaction, Talos Energy, Inc. will have an initial equity market capitalization of approximately $1.9 billion and an enterprise value of approximately $2.5 billion.

"This combination represents an important step in our goal of becoming the premier offshore exploration and production ("E&P") company.  We will have two core areas in the Deepwater U.S. Gulf of Mexico Deepwater and the outstanding new Zama discovery located in the shallow waters of offshore Mexico," stated Timothy S. Duncan, Talos's Chief Executive Officer.  "The combined talent, technical resources and balance sheet of the resulting company will allow us to accelerate development of our own robust project inventory while also giving us the horsepower to pursue compelling transactional and exploration opportunities.  We fully expect to achieve material operating synergies and maximize capital efficiency going forward.  This transaction is a tremendous opportunity for both Talos and Stone as we create a Gulf of Mexico frontrunner."

Neal P. Goldman, Stone's Chairman, stated, "This transaction represents the successful culmination of Stone's previously announced strategic review process and is a compelling opportunity for our shareholders to benefit from the significant upside and synergies of the combined company.  Talos Energy, Inc. will have substantial scale, important asset diversification and a talented management team, along with the strong financial position to continue to grow value for our combined shareholder base.  I am very proud of Stone's success in growing shareholder value since its financial restructuring in February 2017 and I am confident Tim will lead the combined company to even greater success."

James M. Trimble, Stone's Interim Chief Executive Officer and President, stated, "I want to thank our employees for their focus and dedication in

positioning Stone for this important transaction.  The team's management of Stone's assets and business in a safe and environmentally responsible manner will continue our success for the combined shareholder base.  The combined company will be strategically positioned to drive meaningful production growth through complementary acreage positions.  We look forward to this partnership with Tim and the Talos team."

**Combination Benefits and Pro Forma Position**

The combination will create a leading offshore independent E&P company and a leader in the Gulf of Mexico with a large, high quality asset base and leading cost profile.  The combined company will have estimated 2017 average daily production of approximately 47 Mboe and proved reserves of 136 MMboe as of June 30, 2017 based on SEC prices.

The combined company will also benefit from a deep inventory of identified exploration and development prospects and a significant acreage footprint in the Gulf of Mexico, including over 1.2 million combined gross acres, of which approximately 160,000 acres is offshore Mexico.  The Zama oil discovery, operated by Talos, was the first private sector offshore exploration well in the history of Mexico and was previously disclosed as having between 1.4 billion and 2.0 billion gross barrels of original oil in place.  Additionally, the combined company expects to achieve up to $25 million in annual pre-tax synergies from supply chain management and other operational efficiencies by year end 2018.

The new company will have increased financial flexibility, in part through its expected new $1 billion credit facility with an expected $600 million in initial borrowing capacity, and no material long term note maturities until 2022.  Upon closing, the combined company's pro forma unrestricted cash, undrawn credit facility and ability to access public capital markets will provide flexibility to pursue additional attractive growth opportunities.  The combined company is expected to have a pro forma net debt-to-2017E EBITDA ratio of 1.4x and approximately $325 million to $375 million in liquidity at closing.  Talos Energy, Inc. will be well-positioned as the counterparty of choice for drilling and consolidation opportunities in the Deepwater Gulf of Mexico.

**Transaction Details**

Under the terms of the definitive agreement, Talos and Stone will both become wholly-owned subsidiaries of a new holding company, which at closing will become a publicly traded entity.  The new, combined company will be named Talos Energy, Inc. and is expected to trade on the NYSE under the new ticker symbol "TALO."  At closing, Talos stakeholders will own 63% and Stone shareholders will own 37% of the combined company.  Outstanding warrants to acquire Stone common stock will become warrants to acquire Talos Energy,

Inc. common stock with terms and conditions substantially identical to their existing terms and conditions.

**Leadership and Corporate Governance**

Timothy S. Duncan, Talos's Chief Executive Officer, will be Chief Executive Officer of Talos Energy, Inc. with additional members of current Talos and Stone management serving in other key leadership roles.

The combined company's Board of Directors will be comprised of ten members, including six members designated by Talos and four members designated by Stone from its current Board of Directors.  Neal P. Goldman will serve as Non-Executive Chairman of the Board of Directors.

Talos Energy, Inc. will be headquartered in Houston, with additional offices in Lafayette and New Orleans.

**Approvals and Shareholder Agreements**

Completion of the transaction is subject to the approval of Stone shareholders, consent of a majority of the unaffiliated holders of Stone's 7.50% Senior Secured Notes due 2022 and successful completion of an exchange of the Stone notes for Talos notes, certain regulatory approvals and other customary conditions.

Franklin Advisers, Inc. and MacKay Shields LLC, as investment managers for approximately 53% of the outstanding shares of Stone as of September 30, 2017, have entered into voting agreements to vote in favor of the transaction, subject to certain conditions.[1]

23.     The Merger Consideration in the Proposed Transaction is unfair and inadequate, because, among other things, the intrinsic value of the Company and its common stock is materially in excess of the amount offered given the Company's prospects for future growth and earnings.  As a result, the Proposed Transaction will deny Class Members their right to fully share equitably in the true value of the Company.

---

[1] Stone Energy Corporation, Current Report (Form 8-K), at Exhibit 99.1 (Press release dated November 21, 2017, "Talos Energy LLC to Combine with Stone Energy Corporation") (Nov. 21, 2017).

24.     For example, on February 9, 2017, an average of 5 analysts' 12-month price target for the Company's common stock was $7.60 per share, approximately *19%* above where Stone common stock was trading, with one of the analysts targeting as high as $12.00 per share.[2]

25.     On June 12, 2017, Zacks Investment Research—an online website dedicated to providing professional investors with the financial data and analysis—highlighted that Stone resumed drilling operations on its Rampart Deep Prospect in Mississippi and, in response, the Company's common stock gained *27.2%* in the last three months.[3]

26.     On September 6, 2017, Stone realized the benefits of resuming drilling operations at the Rampart Deep Prospect.  While the oil and gas exploration industry decreased 6.8% during the previous three months amid the oil price volatility, Stone's stock *gained 6.7%*.[4]

27.     Most recently, on November 1, 2017, Stone announced its Third Quarter 2017 results.  Notably, the Company turned a profit of $1.3 million, or 6 cents per share, with revenue of $79.5 million.  Furthermore, Stone substantially outperformed analysts expectations, who expected the Company to lose 31 cents per share.[5]

28.     Moreover, the valuation analyses conducted by Petrie in its fairness opinion indicate that the value of Stone's common stock has substantially greater value than represented

---

[2] ETFChannel.com, *The SGY Paradox: Analysts Bearish But Forecast 18.94% Gains* (Feb. 9, 2017), *available at* https://www.thestreet.com/story/13996227/1/the-sgy-paradox-analysts-bearish-but-forecast-1894-gains.html.

[3] *Stone Energy Starts (SGY) Drilling at Rampart Deep Prospect*, ZACKS (June 12, 2017), *available at* https://www.zacks.com/stock/news/263913/stone-energy-starts-sgy-drilling-at-rampart-deep-prospect.

[4] *Stone Energy's (SGY) Rampart Deep Well Sees Drilling Success*, ZACKS (June 12, 2017), *available at* https://www.zacks.com/stock/news/274759/stone-energys-sgy-rampart-deep-well-sees-drilling-success.

[5] *Brief: Stone Energy turns third-quarter profit, while PetroQuest narrows its losses*, AdvisorNews (Nov. 2, 2017), *available at* https://advisornews.com/oarticle/brief-stone-energy-turns-third-quarter-profit-while-petroquest-narrows-its-losses.

by the Merger Consideration.  For example, Petrie's *Precedent Transactions for Stone Energy and Talos Energy* analysis indicated an equity ownership range as high as ***52%*** for Stone stockholders in the combined company, in contrast to the 37% that will result if the Proposed Transaction is consummated.

29.     In sum, Stone's common stock has demonstrated considerable industry value and growth in 2017.  The Company's public common shareholders should be provided with sufficient financial information in the S-4 to make an informed decision regarding the Proposed Transaction.

30.     It is therefore imperative that Stone public common shareholders receive the material information (discussed in detail below) that has been omitted from the S-4, which is necessary for the Company's stockholders to properly exercise their corporate suffrage rights and make a fully informed decision concerning whether to vote in favor of the Proposed Transaction.

**II.     The Transaction Agreement's Deal Protection Provisions Deter Superior Offers**

31.     In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Transaction Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Stone.

32.     First, the Transaction Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for Stone shareholders.  Specifically, the Transaction Agreement generally states that the Company and the Individual Defendants shall: (i) immediately cease, and cause to be terminated any solicitation, encouragement, discussion, or negotiations or any indication of interest that would reasonably be expected to lead to a competing proposal; (ii) immediately terminate access for any person to any data room containing information with respect to Stone; and (iii) request the return

or destruction of any non-public information provided in connection with a competing proposal or any indication of interest that would reasonably be expected to lead to a competing proposal.[6]

33.    Furthermore, the Company and the Individual Defendants must notify within 24 hours, orally or in writing, Discovery of any proposals, indications of interest, and/or draft agreements received from other persons making an acquisition proposal.  *See* Transaction Agreement at *100.

34.    Additionally, the Transaction Agreement grants Talos recurring and unlimited matching rights, which provides it with five days to negotiate with Stone, amend the terms of the Transaction Agreement, and make a counter-offer in the event a superior offer is received.  *See* Transaction Agreement at *102.

35.    The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that Talos can easily foreclose a competing bid.  As a result, these provisions unreasonably favor Talos, to the detriment of Stone's public stockholders.

36.    The Transaction Agreement also provides that Stone must pay Talos a termination fee of $24 million under certain conditions, including in the event Stone elects to terminate the Transaction Agreement to pursue a superior proposal.  *See* Transaction Agreement at *23.  The termination fee provision further ensures that no competing offer will emerge, as any competing

---

[6] Stone Energy Corporation, Current Report (Form 8-K), at Exhibit 2.1, at *99-100 (Transaction Agreement, dated as of November 21, 2017, by and among Stone Energy Corporation, Sailfish Energy Holdings Corporation, Sailfish Merger Sub Corporation, Talos Energy LLC and Talos Production LLC*) (Nov. 21, 2017).

bidder would have to pay a naked premium for the right to provide Stone stockholders with a superior offer.

37.     Ultimately, these preclusive deal protection provisions restrain Stone's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

38.     Given that the preclusive deal protection provisions in the Transaction Agreement impede a superior bidder from emerging, it is imperative that Stone's stockholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Transaction.

## III.     The Materially Incomplete and Misleading S-4

39.     On December 29, 2017, Defendants authorized the filing of the materially incomplete and misleading S-4 with the SEC.  The information contained in the S-4 has thus been disseminated to Stone common stockholders to solicit their vote in favor of the Proposed Transaction.  Therefore, Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any materially misrepresentations or omissions.  However, the S-4 misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision concerning whether or not to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### *Material Omissions Concerning Stone's Financial Projections*

40.     First, the S-4 provides several non-GAAP financial metrics, including EBITDA, Discretionary Cash Flow, and Free Cash Flow, for both Stone and Talos, but fails to provide the line item projections detailed below for the metrics used to calculate these non-GAAP measures.

41. First, for both Stone and Talos, the S-4 defines EBITDA as "earnings before interest, taxes, depreciation and amortization" and, with respect to Stone, "EBITDA for 2017 was adjusted to give effect to an asset disposition and Stone Energy's emergence from bankruptcy." However, the S-4 fails to provide values for: (i) interest; (ii) taxes; (iii) depreciation; (iv) amortization; and (v) the adjustments made to Stone's 2017 EBITDA.

42. Second, for both Stone and Talos, the S-4 defines Discretionary Cash Flow as "cash flow from operations before changes in working capital." But the S-4 fails to provide values for: (i) cash flow from operations; and (ii) changes in working capital.

43. Third, for both Stone and Talos, the S-4 defines Free Cash Flow as "Discretionary Cash Flow adjusted for changes in working capital and capital expenditures." However, the S-4 fails to provide values for: (i) changes in working capital; and (ii) capital expenditures.

44. Failure to provide complete and full disclosure of the line item projections for the metrics used (*e.g.*, interest, taxes, capital expenditures) to calculate the above-mentioned non-GAAP metrics leaves Stone stockholders without the necessary, material information to reach a fully-informed decision concerning the Company, the fairness of the Merger Consideration, and, ultimately, whether to vote in favor of the Proposed Transaction. In fact, not only has Stone previously provided its stockholders with the above-mentioned information, but the Company's disclosure of such information has also illustrated that there is a substantial difference between the GAAP and non-GAAP financial metrics. For example, the chart below is from Stone's Third Quarter 2017 press release, which were announced on November 1, 2017:

**STONE ENERGY CORPORATION**

**RECONCILIATION OF NON-GAAP FINANCIAL MEASURE**

**DISCRETIONARY CASH FLOW to NET CASH PROVIDED BY OPERATING ACTIVITIES**

(In thousands)

(Unaudited)

| | Successor Three Months Ended September 30, 2017 | Predecessor Three Months Ended September 30, 2016 |
|---|---|---|
| **Net income (loss) as reported** | $1,297 | ($89,635) |
| **Reconciling items:** | | |
| Depreciation, depletion and amortization | 27,553 | 58,918 |
| Write-down of oil and gas properties | — | 36,484 |
| Deferred income tax provision | — | 1,888 |
| Accretion expense | 8,095 | 10,082 |
| Loss on sale of oil and gas properties | 132 | — |
| Non-cash stock compensation expense | 502 | 1,725 |
| Non-cash interest expense | 3 | 4,875 |
| Non-cash derivative expense (1) | 7,879 | 236 |
| Other non-cash expense | 56 | — |
| **Discretionary cash flow** | 45,517 | 24,573 |
| Change in income taxes payable | (1,578) | 24,771 |
| Settlement of asset retirement obligations | (20,293) | (4,400) |
| Other working capital changes | 18,844 | (9,921) |
| **Net cash provided by operating activities** | $42,490 | $35,023 |

45.     In fact, Talos has also previously provided its stockholders with the above-mentioned information, which has illustrated the substantial difference between the GAAP and non-GAAP financial metrics.  For example, the chart below is from Talos' Third Quarter 2017 press release, which were announced on November 21, 2017:

| | | Three Months Ended September 30, 2017 |
|---|---|---|
| **Reconciliation of net loss to Adjusted EBITDA:** | | |
| Net income (loss) | $ | (36,177) |
| Interest expense | | 21,464 |
| Depreciation, depletion and amortization | | 37,746 |
| Accretion expense | | 4,299 |
| Transaction related costs | | 3,383 |
| Derivative fair value gain[1] | | 28,086 |
| Net cash receipts on settled derivative instruments[1] | | 8,619 |
| Non-cash equity-based compensation | | 275 |
| Adjusted EBITDA | $ | 67,695 |
| **Production:** | | |
| Boe[2] | | 2,637 |
| **Other Financial Data:** | | |
| Adjusted EBITDA per Boe[2] | $ | 25.67 |

46.     The omission of the above-referenced projections renders the financial projections included on pages 110 through 114 of the S-4 materially incomplete and misleading.  If a registration statement discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft

information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

47.     Furthermore, complete disclosure of the above-mentioned information omitted from the financial projections is particularly important for Stone public common stockholders in light of the fact that the Merger Consideration is stock in another company.

### Material Omissions Concerning Petrie's Financial Analyses

48.     The S-4 describes Petrie's fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Petrie's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, Stone's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Petrie's fairness opinion in determining whether to tender their shares in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to Stone's public common stockholders.

49.     With respect to Petrie's *Discounted Cash Flow Analysis*, the S-4 fails to disclose the following key components used in the analysis: (i) for both Stone and Talos, the inputs and assumptions underlying the calculation of the after-tax discount rate range of 9% to 30%; (ii) for both Stone and Talos, the value of each company's estimated administrative expenses, commodity derivatives, and other assets and liabilities, long-term debt, capitalized leases, and net working capital as of September 30, 2017; and (iii) for Talos only, the value of the senior unsecured notes that will be exchanged in the Proposed Transaction.  *See* S-4 101-02.

50.     These key inputs are material to Stone common stockholders, and their omission renders the summary of Petrie's *Discounted Cash Flow Analysis* incomplete and misleading.  As

a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id.*  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars…. This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices***. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

51.     Similarly, with respect to Petrie's *Going Concern Analysis*, the S-4 fails to disclose: (i) for Stone, the inputs and assumptions underlying the calculation of the terminal EBITDA multiples of 3.5x, 4.0x, and 4.5x applied to estimated 2021 EBITDA; (ii) for Talos, the inputs and assumptions underlying the calculation of the terminal EBITDA multiples of 4.5x, 5.0x, and 5.5x applied to estimated 2021 EBITDA; (iii) for both Stone and Talos, for Stone, the inputs and assumptions underlying the calculation of the discount rates ranging from 9.0% to 13.0%; (iv) for both Stone and Talos, the value of each company's long-term debt and cash as of September 30, 2017; and (v) for Talos, the value of the company's capitalized leases as of September 30, 2017 and the senior unsecured notes that will be exchanged in the Proposed Transaction.  *See* S-4 108.

52.     With respect to Petrie's *Precedent Transactions for Stone Energy and Talos Energy* analysis, the S-4 fails to disclose the individual multiples Petrie calculated for each transaction evaluated.  Furthermore, the analysis fails to disclose: (i) the value of Stone's long-term debt and net working capital as of September 30, 2017; (ii) the research analysts considered and their respective estimates of Talos' net asset value for certain Mexican assets; (iii) the value of Talos' long-term debt, capitalized leases, and net working capital as of September 30, 2017; and (iv) the value of Talos' senior unsecured notes that will be exchanged in the Proposed Transaction.  *See* S-4 103.

53.     Likewise, with respect to Petrie's *Precedent Transactions—Oil & Gas Corporate Transactions* analysis, the S-4 fails to disclose the individual transaction multiples and premiums paid multiples that Petrie calculated for each transaction evaluated.  Furthermore, the analysis fails to disclose: (i) for both Stone and Talos, the value of each company's long-term debt and cash as of September 30, 2017; (ii) for Talos, the value of the company's capitalized leases as of September 30, 2017 and the senior unsecured notes that will be exchanged in the Proposed Transaction.  *See* S-4 105-06.

54.     Similarly, with respect to Petrie's *Capital Market Comparison Analysis*, the S-4 fails to disclose the individual multiples Petrie calculated for each transaction evaluated.  In addition, the S-4 fails to disclose the value for Stone's and Talos' long-term debt, capitalized leases, and cash as of September 30, 2017, as applicable, and for Talos only, senior unsecured notes that will be exchanged in the Proposed Transaction.  *See* S-4 107-08.

55.     With respect to Petrie's *Precedent Transactions for Stone Energy and Talos Energy* analysis, *Precedent Transactions—Oil & Gas Corporate Transactions* analysis, and *Capital Market Comparison Analysis*, the omission of the individual multiples renders the summary of

these analyses and the implied equity reference value ranges materially misleading. A fair summary of theses analyses requires the disclosure of the individual multiples for each company and transaction; merely providing the range that a banker applied is insufficient, as Stone stockholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied equity reference value ranges.

56. In sum, the omission of the above-referenced information renders the S-4 materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the expiration of the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

57. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

58. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

59.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

60.     The omission of information from a registration statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

61.     Defendants have issued the S-4 with the intention of soliciting Stone's common stockholders' support for the Proposed Transaction.   Each of the Defendants reviewed and authorized the dissemination of the S-4, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company; (ii) the valuation analyses performed by the Company's financial advisor, Petrie, in support of their fairness opinions; and (iii) the background process leading to the Proposed Transaction.

62.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the S-4, but nonetheless failed to obtain and disclose such information to Stone's common stockholders although they could have done so without extraordinary effort.

63.     The Individual Defendants knew or were negligent in not knowing that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted

information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the S-4 states that Petrie reviewed and discussed their financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Petrie, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Transaction Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to, separately, review Petrie's analyses in connection with their receipt of the fairness opinions, question Petrie as to the derivation of fairness, and be particularly attentive to the procedures followed in preparing the S-4, and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

64.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the S-4.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the S-4 or failing to notice the material omissions in the S-4 upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Transaction Agreement and the preparation of the Company's financial projections.

65.     Stone is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4.

66.     The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

67.     Plaintiff incorporate each and every allegation set forth above as if fully set forth herein.

68.     The Individual Defendants acted as controlling persons of Stone within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Stone, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

69.     Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had

the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

71.     In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Transaction Agreement. The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

72.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

73.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

74.     Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding with the common shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the S-4;

C.      Rescinding, to the extent already implemented, the Merger or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.      Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants wrongdoing;

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.      Granting such other and further equitable relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 4, 2018

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE 19801
(302) 984-3800

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
Miles D. Schreiner
350 Fifth Avenue, Suite 4405
New York, NY 10118
Telephone: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com
mschreiner@monteverdelaw.com

*Attorneys for Plaintiff*